# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF

## NEW YORK

|  |  |  |
|---|---|---|
| DAVID DINKEVICH and ANN CARTER, derivatively on behalf of AMC ENTERTAINMENT HOLDINGS, INC., | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | No. |
| ADAM A. ARON, CRAIG R. RAMSEY, CHRIS A. COX, LINCOLN ZHANG, JACK Q. GAO, LLOYD L. HILL, HOWARD W. KOCH, JR., GARY F. LOCKE, KATHLEEN M. PAWLUS, ANTHONY J. SAICH, and MAOJUN ZENG, | ) ) ) ) ) ) ) ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| Defendants, | ) ) |  |
| and | ) ) |  |
| AMC ENTERTAINMENT HOLDINGS, INC., | ) ) ) |  |
| Nominal Defendant. | ) ) |  |

Plaintiffs David Dinkevich ("Dinkevich") and Ann Carter ("Carter") (together, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant AMC Entertainment Holdings, Inc. ("AMC" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment beginning no later than December 2016 and continuing to the present (the "Relevant Period").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the pre-suit investigation conducted by and through their attorneys, which included, among other things, a request and inspection of certain non-public books and records pursuant to *8 Del. C. § 220* in October of 2019, statements made by the Company and Individual Defendants (defined below), United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AMC, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.   NATURE OF THE ACTION

1.     This is a shareholder derivative action brought for the benefit of nominal defendant AMC against certain current and former officers and directors based on their breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.      AMC is the largest movie theater chain worldwide and owns and operates movie theaters throughout the United States and Europe. During 2016 and 2017, AMC's directors and

officers sought to solidify this position through growth by acquisitions of competing cinema chains. AMC was, however, heavily burdened with debt and need to raise additional capital to finance further acquisitions.

3.      On December 21, 2016, AMC's senior management and Board of Directors (the "Board") caused AMC to file with the SEC a Form S-3 registration statement (this S-3 incorporated a prospectus and prospectus supplements that were later filed with the SEC) which offered to sell 21,904,761 shares of AMC stock in a Secondary Public Offering ("SPO") at a price of $31.50 per share. Net proceeds from the SPO would total approximately $618 million.

4.      Shortly before the SPO, during the fourth quarter of 2016, AMC made two major acquisitions: Carmike Cinemas, Inc. ("Carmike") ($1.1 billion on December 2016), which owned and operated movie theaters throughout the United States; and Odeon and UCI Cinemas Holdings Limited ("Odeon") ($1.2 billion on November 30, 2016), which owned and operated movie theaters in seven European countries. These acquisitions were primarily financed with debt, causing the Company's indebtedness of $3.4 billion as of September 30, 2016 to nearly double to $6.6 billion by December 31, 2016. On January 23, 2017, AMC announced it had agreed to acquire Stockholm-based Nordic Cinema Group Holding AB ("Nordic") ($964 million on March 28, 2017).

5.      According to the SPO filings and a press release issued on February 7, 2017, the SPO was undertaken to repay a bridge loan AMC had procured to acquire Carmike and finance a portion of the Nordic acquisition. Prior to the Carmike, Odeon and Nordic acquisitions, AMC had been enjoying positive financial performance, announcing record-setting results during 2015 and 2016.

6.      The defendants primarily attributed AMC's record-breaking financial results to

the success of two strategic growth initiatives: (i) reseating a large number of its theaters with reclining chairs; and (ii) introducing an expanded selection of higher quality and higher-revenue food and beverage menu offerings in its theaters. These changes to AMC's theaters purportedly enhanced the movie-going experience and had been well received by customers, particularly because AMC's theaters are primarily located in more affluent, major metropolitan markets.

7.       Defendant Adam Aron ("Aron"), AMC's Chief Executive Officer ("CEO") and President and a director of the Company, represented publicly that reseating theaters with reclining chairs had reduced the seating capacity at the redesigned AMC theaters by approximately 50% to 60%, but it nonetheless resulted in a 60% increase in patron attendance at such theaters. AMC had fully embraced a higher-end level of services and this strategy had clearly performed well.

8.       In contrast, Carmike operated a hometown theater chain across the country serving mid-size, non-urban markets. As a result, only a relatively small percentage of theaters within the Carmike chain are located in markets capable of supporting a more patron-costly, AMC-style theater, with reclining seats and upscale food and beverage offerings. AMC's senior officers and directors publicly represented that the Company expected to derive a financial benefit from the acquisition of Carmike by realizing $35 million in annual operating synergies, *i.e.*, from reduced film exhibition, concession, overhead, general and administrative and other expenses, and by reseating approximately 15% of Carmike movie screens with reclining chairs in those markets where the undertaking was financially prudent.

9.       Upon completion of the Odeon acquisition, AMC began operating its business via two reportable segments: the U.S. markets segment and the International markets segment. As of December 31, 2017, the Company owned, operated, or held interests in 649 theaters with a total of 8,224 screens in the United States and 365 theaters with 2,945 screens in Europe.

10.      On May 8, 2017, AMC reported its financial results for the quarter ended March 31, 2017.  On this day, the Company's stock closed at $28.80 – or approximately 9% lower than the SPO price less than six months earlier.  The Company also held a conference call with stockholders and analysts, during which defendant Aron disclosed that the previously undisclosed operational challenges which had been causing Carmike to financially underperform made Carmike an attractive acquisition candidate, stating that "one of the allures to us of acquiring Carmike" was the "revenue weakness" it had been experiencing during 2016.

11.      ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

12.      On August 4, 2017, certain of the defendants held a conference call with investors and securities analysts to discuss AMC's reported operating results for the period ended June 30, 2017. During the August 2017 Conference Call, defendant Aron stated that "the quarter was simply a bust" because of four specific matters that were having a material adverse effect on the Company's results. One of the four matters identified was the performance of Carmike, which Aron reported had a revenue decline of 11.3% during the 2017 second quarter, while the Company's legacy AMC theaters, which he referred to as "stars," outperformed relative to the U.S. industry box office average.

---

[1]      References to the non-public documents produced by AMC to Plaintiffs pursuant to *8 Del. C. § 220* are in Bates numbered form as received from AMC: "AMC_220_XXXXXXXXX".

13.     Defendant Aron then provided three reasons for Carmike's underperformance. First, defendant Aron stated that Carmike had experienced a protracted period of underinvestment in its theaters. Second, Aron noted that Carmike's customers had migrated to competitors theaters which had renovated and upgraded their facilities. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

14.     Third, Aron said that AMC had not been able to retain the bulk of Carmike's loyalty program members following AMC's acquisition. Mr. Aron said that Carmike's underperformance would continue and that "it's going to take us a good year to essentially turn around Carmike. So I do think this [underperformance] is going to continue with us until '18."

15.     Again, none of these problems with Carmike's business had been previously disclosed by defendants prior to the Carmike acquisition, or prior to the SPO. Despite spearheading the Carmike, Odeon and Nordic acquisitions, AMC's stock has fallen precipitously since these events. The SPO was priced at $31.50 per share on Dec. 26, 2016. Currently, AMC's stock is trading for approximately $3.50 per share.

16.     AMC investors filed a class action in this Court against the Company and certain of its directors and senior officers for alleged violations of the federal securities laws in February 2018. The securities class action lawsuit, captioned *Hawaii Structural Ironworkers Pension Trust*

*Fund v. AMC Entertainment Holdings, Inc., et al.*, Lead Case. No. 1:18-ev-00299-AJN-HP ("the Securities Class Action"), names the following individual defendants: Aron, Craig R. Ramsey ("Ramsey"), Chris A. Cox ("Cox"), Lin Zhang ("Zhang"), Jack Q. Gao ("Gao"), Maojun Zeng ("Zeng"), Anthony J. Saich ("Saich"), Lloyd Hill ("Hill"), Gary F. Locke ("Locke"), Howard W. Koch, Jr. ("Koch"), and Kathleen M. Pawlus ("Pawlus"). The "Class Period" in the Securities Class Action has been defined as the period running from December 20, 2016 through August 1, 2017.

17.      The Securities Class Action alleges that the defendants knew of issues with Carmike, for example, that after Carmike agreed to the merger, it had stopped making investments in its business, which caused it to lose customers; and that two or Carmike's "biggest, most successful" theaters were closed for renovation for more than a year. The Securities Class Action alleges that these issues were not identified in the SPO materials.

18.      Likewise, the Securities Class Action alleges that Company officials failed to disclose known problems with AMC's European theater acquisitions, Odeon and Nordic. AMC's second-largest source of revenue (after ticket sales) is food and beverage sales, but in Europe, its costs for food and beverages were about 50% higher than in the US. In addition, the Securities Class Action alleges that the Nordic and Odeon properties were slower during the summer season, which is counter-cyclical to U.S. trends. The Securities Class Action alleges that this information was known to senior Company executives prior to the SPO, but was not disclosed in the offering materials filed with the SEC.

19.      Importantly, the allegations asserted in the Securities Class Action include the accounts of multiple confidential witnesses who were current and/or former employees of AMC. These individuals have been described by job title, description of duties and geographical location.

It is alleged that one of these witnesses, described as CW-2 in the operative Second Amended Class Action Complaint (the "Securities Complaint"), states that she oversaw 10% of Carmike theaters located in 12 states across the Western US. CW-2 claims that 70% of these theaters were in "disrepair" and would likely hold true for the entire population of Carmike theaters. CW-2 further stated that Carmike "consciously neglected" the theater chain. It is further alleged that CW-2 stated that AMC representatives have access to all of Carmike's operational and financial data on a real time basis for months during the due diligence process.

20.    As stated above, as the Carmike, Oden and Nordic facilities were added to AMC's line, AMC's financial results took a nosedive. The Company's stock price has lost approximately 90% of its value since the SPO. This corresponds to a loss of market capitalization of approximately $3 billion.

21.    Prior to instituting this derivative lawsuit, Plaintiffs conducted a thorough pre-suit inspection pursuant to *8 Del. C. § 220* and reviewed more than four thousand pages of non-public Company records. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

22.    On September 23, 2019, this Court denied in substantial part the defendants' motion to dismiss the Securities Complaint. In so doing, this Court concluded that it had been sufficiently alleged that AMC's public disclosures during the Class Period omitted material information regarding: (i) Carmike's underinvestment in its theaters; (ii) the poor state of

Carmike's loyalty program; and (iii) the seasonality of AMC's European business. In sustaining claims against defendant Aron under Section 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court further concluded that it was sufficiently alleged that defendant Aron acted with scienter – stated another way, that Aron acted during the Class Period with the intent to defraud AMC investors.

23.     In its ruling in the Securities Class Action on September 23, 2019, this Court also sustained claims against all of the individual defendants named herein, including *a majority of the current members of the Board*, under Sections 11 and/or 15 of the Securities Act of 1933 (the "Securities Act").  These directors are defendants Aron, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus. A majority of AMC's current Board members, therefore, are conflicted by the claims asserted against them in the Securities Class Action, which are based on the same factual allegations at issue herein.

24.     Indeed, in light of the Securities Class Action, it is not possible for a majority of the members of the Board to consider a demand disinterestedly and impartially. If the Company pressed forward with its rights of action against those defendants, then the Company's efforts would undercut or even compromise the defense of the Securities Class Action. Under these circumstances, any demand on the Board to bring the asserted claims would be futile.

25.      Moreover, while AMC is a public company, it is controlled by a Chinese conglomerate, Dalian Wanda Group Corp. ("Wanda"). AMC has a roughly 50-50 dual share class structure, with Class A shares being generally available to the public and Class B shares being held by Wanda. Class B shares are entitled to a three vote per share vs one vote per share for Class A shares. Wanda owns 100% of the Company's Class B shares. This means that, per AMC's most recent Proxy Statement on Form DEF 14A, "Wanda controls a majority of the combined voting

power of our Common Stock at the record date and therefore will be able to control all matters submitted to our stockholders for approval at the Annual Meeting."

26.     Thus, in essence, Wanda fully controls all aspects of AMC, and AMC stockholders have virtually no say in any matter, including Board elections, compensation of executive officers and directors, and the selection of the Company's accounting firm. The Company's own SEC filings admit that the Board is beholden to Wanda, and is not independent of the parent company's interest.

27.     As detailed further herein, due to the Individual Defendants' misconduct, the Company has been severely damaged. This derivative action seeks to recover those damages for the benefit of the Company from the true wrongdoers – the officers and directors of AMC.

## II.     JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has exclusive jurisdiction pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78(aa).

29.      This Court has supplemental jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

30.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because: (a) one or more

of the defendants either resides in or maintains offices in this District; and (b) a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## III.   THE PARTIES

33.   Plaintiff Dinkevich is a current holder of AMC common stock and has continuously held AMC common stock since at least December 31, 2014.

34.   Plaintiff Carter is a current holder of AMC common stock and has continuously held AMC common stock since at least June 30, 2016.

35.   Nominal Defendant AMC, according to its public filings, is principally involved in the theatrical exhibition business and owns, operates or has interests in theaters located throughout the U.S. and Europe. AMC is incorporated under the laws of Delaware and is headquartered in Leawood, Kansas.  The Company's common stock is traded on the NYSE under the ticker symbol "AMC."  The Company is an indirect subsidiary of Wanda, a Chinese private conglomerate.

36.   Defendant Aron has served as President and CEO of AMC, and a member of the Board, since January 2016.  Defendant Aron's total compensation for 2016 was more than $10.9 million.  Defendant Aron's total compensation for 2017 was nearly $7.5 million.

37.   Defendant Ramsey joined the Company in 1995 and served in various roles before retiring, effective February 28, 2020. During the Relevant Period up until his retirement, defendant Ramsey served as Executive Vice President and Chief Financial Officer ("CFO") of AMC.  Defendant Ramsey's total compensation for 2016 was more than $2.65 million.  Defendant Ramsey's total compensation for 2017 was nearly $2.35 million.

38.   Defendant Cox joined the Company in 2000 and has held various positions since that time.  Since June 2010, defendant Cox has served as Senior Vice President and

Chief Accounting Officer ("CAO") of AMC.

39.      Defendant Zhang first served as Chairman of the Board from August 2012 until March 2018, and rejoined the Board (again, as Chairman) in December 2019.  Defendant Zhang is described in AMC's SEC filings as an employee of AMC's controlling stockholder, Wanda. As of the filing of AMC's 2017 Proxy Statement, defendant Zhang was described as the President of Wanda Cultural Industry Group, a position he held since 2012. Zhang has also served on the board of directors of Wanda Cinemaline Corporation since November 2006, Dalian Wanda Commercial Properties Co., Ltd. since December 2009, and Dalian Wanda Group Co., Ltd. since February 2011.

40.      Defendant Zeng has been a director of AMC since February 2016 and previously served as AMC's Chairman between March 2018 and December 2019. As of the filing of AMC's 2017 Proxy Statement, defendant Zeng was described as the President of Wanda Cinema Line Co., Ltd, a subsidiary of Wanda Group, since March 27, 2014, and a member of its Board of Directors since July 30, 2013. Zeng previously served as the Assistant to the President of Wanda Cultural Industries Group and Vice President of Wanda Cinema Line Corporation since February 28, 2012.

41.      Defendant Saich has been a director of AMC since August 2012 and is a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee.

42.      Defendant Hill has been a director of AMC since December 2013 and is a member of the Audit Committee.

43.      Defendant Locke has been a director of AMC since February 2016 and is a member of the Nominating and Corporate Governance Committee.

44.      Defendant Koch has been a director of AMC since October 2014 and is a member of the Nominating and Corporate Governance Committee.

45.     Defendant Pawlus has been a director of AMC since December 2014 and serves as Chair of the Audit Committee.

46.     Defendant Gao was a director of AMC from September 2015 until his resignation on October 27, 2017. As of the filing of AMC's 2017 Proxy Statement, Defendant Gao was described as the Group Vice President of Wanda Cultural Industry Group and the CEO of Wanda Film Holdings Company and had held such positions since joining the Wanda Group in June 2015. Sometime in or after February 2017, Defendant Gao received a $1.5 million bonus payment related to his service as a director of AMC.

47.     Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch, and Pawlus are collectively referred to herein as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued

by the Company.

50.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

51.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a)  manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b)  neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c)  establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d)  neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business,

to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g)  ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h)  remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

52.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

53.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the Code "is applicable to all of our directors, officers, including designated officers, and other associates . . . and provides a general statement of our expectations regarding ethical

standards to which such persons are expected to adhere."

54.     The Code of Ethics provides, as to "Accurate and Timely Periodic Reports,"

that:

> [W]e expect our designated officers and others responsible for such matters to conduct themselves in such a way that we will:
>
> - comply with generally accepted accounting principles at all times;
>
> - maintain a system of internal accounting controls that will provide reasonable
>
> - assurances to management that all transactions are properly recorded;
>
> - maintain books and records that accurately and fairly reflect our transactions;
>
> * * *
>
> - maintain a system of disclosure controls and procedures that will provide
>
> - reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our periodic reports are being prepared; and
>
> - present information in our periodic reports and other public communications in a full, fair, accurate, timely, clear and understandable manner.

55.     The Code of Ethics provides, as to "Internal Financial Controls and Reports,"

that:

> Accounting control standards and procedures exist to ensure that our assets are protected and properly used and our financial reports and records are accurate and reliable. The accuracy of these reports depends upon the accuracy of the information provided. All documents supporting the financial records should be accurate and should reflect the true nature of the transaction. You should not falsify or otherwise provide information that is not accurate or complete in connection with any Company form or record

56.     The Code of Ethics provides, as to "Reporting Concerns" as follows:

> Any known or suspected violation of this Code of Ethics should be reported promptly to your supervisor, the Company's Compliance Director or the Company's General Counsel. In this regard, failure to report any violation and impeding an investigation will be deemed a violation of this Code of Ethics.

57.     The Company's Corporate Governance Guidelines and Principles (the "Governance Guidelines") provide that the Board is duty-bound to "manage and direct the affairs of the Company in the Company's best interests including the interest of the shareholders in the long-term health and overall success of the business."   Among other things, the Governance Guidelines specifically obligate the Board to "design[] governance structures and practices to position the Board to fulfill its duties effectively and efficiently," to "oversee[] compliance with applicable laws and regulations," and to provide oversight of "disclosure controls and procedures."

58.     The Company's Audit Committee Charter provides that the members of the Company's Audit Committee are responsible for, among other things, overseeing: (a) management's conduct of, and the integrity of, the Company's financial reporting to any governmental or regulatory body, shareholders, other users of Company financial reports and the public; (b) the Company's systems of internal control over financial reporting and disclosure controls and procedures; (c) the Company's legal and regulatory compliance; and (d) the application of the Company's codes of business conduct and ethics.

59.     The Company's Nominating and Corporate Governance Committee Charter provides that the members of that committee are duty-bound to assist the Board in developing, recommending to the Board and overseeing implementation of the Governance Guidelines, and reviewing regularly the overall corporate governance of the Company.   In connection with those duties, "the Committee is empowered to inquire into any matter it considers appropriate to carry out its responsibilities."

## V.      FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.      AMC's Operations and Recent History

60.     AMC owns, operates, or has interests in theaters internationally. AMC offers consumers traditional film programming, independent and foreign films, performing arts, and music and sports programming. At its theaters, the Company also sells food and beverage products, including made-to-order meals, coffee, snacks, beer, wine, cocktails, and dine-in theater options.

61.     The Company's revenues are derived primarily from box office admissions. Its next largest source of revenue is from theater food and beverage sales, but AMC also generates revenue from other sources, including on-screen advertising, fees earned from "Stubs" (its customer loyalty program), the rental of theater auditoriums, income from gift card and exchange ticket sales, and online ticketing fees.

62.     The AMC "Stubs" loyalty program allows members to earn rewards, receive discounts, and participate in exclusive offerings and services. Under the Individual Defendants' direction, the Company has claimed that the Stubs program strengthens guest loyalty, attracts new guests, and drives return visits. As of December 31, 2016, more than 5.2 million active member households were enrolled in AMC's Stubs program.

63.     In 2011, AMC began a project to replace existing seats with electric recliners, costing approximately $450,000 per screen, or approximately $5 million per theater. As part of this initiative, AMC also sought to improve its theater lobbies, concessions, and bathrooms, and upgraded its theater technologies. Appealing to a new generation, AMC also began to offer a wider range of food and beverage alternatives that went beyond the traditional assortment of popcorn, candy, snacks, and sodas.

64.     These improvements to AMC's theater offerings—though more expensive for consumers—yielded significant financial returns for the Company. AMC's upgrades have been well received by consumers, particularly because its theaters are primarily located in more affluent

metropolitan markets.

65.     In August 2012, Wanda acquired AMC in a $2.6 billion deal. At that time, AMC operated 346 multiplex theaters—mostly located in the U.S. and Canada—comprising over 5,000 screens. As a part of the deal, Wanda announced that it planned to invest as much as $500 million in AMC. AMC eventually went public in December 2013, but Wanda retained a majority of the shares and firm control of the Company.

### B.     Aron's Appointment as CEO and AMC's Expansion Drive

66.     Defendant Aron was appointed as AMC's new CEO on December 15, 2015, replacing his predecessor, Gerry Lopez, who had resigned in August 2015. Aron officially assumed his duties as CEO of AMC on January 4, 2016 and immediately embarked on an aggressive and poorly managed acquisition spree that included significant acquisitions of Carmike, Odeon, and Nordic, making AMC the largest theater company in the world.

67.     Adhering to the adage "time is the enemy of all deals," Aron wasted absolutely none of it in engaging with the CEO of Carmike, stating in an interview published on March 4, 2016: "I called the CEO of Carmike on my first week of the job . . . We had dinner on the third week. There was no reason to go slow." AMC and Carmike quickly issued a joint press release on March 3, 2016 announcing their intent to complete the acquisition, pursuant to a definitive merger agreement, for approximately $1.1 billion.

68.     At the time, under the Individual Defendants' direction, AMC agreed to acquire all of Carmike's outstanding shares for $30 per share in cash and to assume Carmike's net indebtedness, funding the transaction with cash on hand and incremental debt financing from Citigroup (the "March 2016 Debt Commitment"). The March 2016 Debt Commitment included a senior secured incremental term loan in an aggregate amount of up to $560 million and a senior subordinated bridge loan in an aggregate amount of up to $300 million.

69.     Aron justified the Carmike acquisition publicly during a March 4, 2016 conference call in which he cited the two companies' complementary geographic footprints, with AMC's legacy theaters being located in major metropolitan markets, especially in the Northeast, Midwest, and on the West Coast, while Carmike operated a hometown theater chain serving mid-size, non-urban markets across the country, particularly in the South and Southeast.

70.     There was a fundamental flaw, however, with Aron's rationale. AMC's pre-acquisition strategic growth initiatives, including its redesigned seating and expanded menu options, among other things, had been very successful for the Company in large part because they appealed to the more affluent metropolitan consumers in its legacy markets. That new type of theater experience— which costs more for patrons—was not compatible with the hometown, non-urban markets AMC was acquiring in the Carmike deal. Accordingly, Aron explained publicly in March 2016 that AMC would not be embarking on full-scale redesign in these new, hometown markets as it had previously done in its legacy markets.

71.     Instead, Aron said the Company would only redesign approximately 15% of Carmike's movie screens with fancier reclining chairs and would do so over a five-year period, costing the Company an estimated $50 to $60 million. Explaining that AMC would largely retain Carmike's "lower cost structure at theaters with lower visitation," Aron claimed that the Company "will be laser-like in our pursuit of cost synergies, whether that be film exhibition expense, concessions, operating expense, G&A, overhead cost, you name it, we will be turning over every rock to get those synergies that are out there for the taking . . . ."

72.     On July 25, 2016, under the Individual Defendants' direction, AMC announced that it had entered into an amended and restated merger agreement with Carmike pursuant to which AMC agreed to acquire all of the outstanding shares of Carmike for $33.06 per share in cash and

stock (up from $30 per share), and to assume Carmike's net indebtedness. AMC also entered into an amended and restated debt financing commitment (the "July 2016 Debt Commitment") with Citigroup, Merrill Lynch, Credit Suisse, HSBC Securities (USA) Inc., HSBC Bank USA, N.A., Barclays Bank PLC, Credit Suisse AG, and Bank of America, N.A. The July 2016 Debt Commitment included a senior secured incremental term loan in an aggregate amount of up to $225 million (down from the $560 million in the March 2016 Debt Commitment) and a senior subordinated bridge loan in an aggregate amount of up to $300 million.

73.     On December 21, 2016, under the Individual Defendants' direction, AMC completed its acquisition of Carmike for $858.2 million, including $584.3 million in cash, 8.2 million shares of AMC common stock worth $273.9 million, and the assumption of $230 million of Carmike debt. To finance the acquisition, AMC entered into a $350 million bridge loan agreement with Citicorp North America, Inc., as administrative agent, and Citigroup, Merrill Lynch, and Credit Suisse as joint lead arrangers and bookrunners. In the acquisition, AMC acquired 271 Carmike theaters in 41 U.S. states comprising 2,923 screens.

74.     That same day, December 21, 2016, the Individual Defendants caused AMC to file with the SEC a Form S-3 registration statement, incorporating a prospectus and prospectus supplements (collectively referred to herein as the "Registration Statement")[2] offering to sell to the public 21,904,761 shares of common stock, including 2,857,142 shares pursuant to an overallotment option issued to the Company's underwriters, at a price of $31.50 per share. The Registration Statement provided AMC with net proceeds of approximately $618 million.

C.     **The Odeon and Nordic Acquisitions**

---

[2]     AMC filed its prospectus supplements with the SEC on February 7 and 9, 2017.

75.     Continuing the merger spree, on November 30, 2016, the Individual Defendants caused AMC to announce it had completed the acquisition of Odeon, the largest theater operator in Europe. In a transaction valued at approximately $1.2 billion, AMC acquired Odeon in exchange for $480.3 million in cash, 4.5 million shares of AMC common stock worth $152.7 million, and the repayment of $593.2 million of Odeon debt. As of the acquisition date, Odeon operated 242 theaters with 2,243 screens in the United Kingdom, Spain, Italy, Germany, Austria, Portugal, and Ireland. To fund the acquisition, AMC relied in part on borrowing an additional $500 million.

76.     Upon completion of the Odeon acquisition, AMC began operating under two reportable business segments: the U.S. markets segment and the International markets segment.

77.     Under the Individual Defendants' direction, AMC was not done with its flurry of corporate deals. In addition to Carmike and Odeon, on January 23, 2017, AMC announced it had agreed to acquire yet another company, Nordic, the largest theater exhibitor in Scandinavia and the Baltic nations. In connection with the announcement, AMC entered into another debt financing commitment (the "January 2017 Debt Commitment") with Citigroup, pursuant to which Citigroup agreed to provide AMC with a $675 million term loan and a $325 million bridge loan. To fund the Nordic acquisition, AMC issued $475 million and £250 million in notes on March 17, 2017.

78.     On March 28, 2017, AMC completed the Nordic acquisition in an all-cash transaction valued at $964 million. As of March 31, 2017, Nordic operated 71 theaters with 467 screens in approximately 50 large- and medium-sized cities in Scandinavia and the Baltic nations. Nordic also held a substantial minority investment in 51 other theaters comprising 216 additional screens.

79.     As of December 31, 2017, the Company owned, operated, or held interests in

649 theaters with a total of 8,224 screens in the United States and 365 theaters with 2,945 screens in Europe.

**D.      Under Individual Defendants' Direction, AMC Relies on Debt to Finance Aggressive Acquisitions**

80.      To finance these large-scale acquisitions by the Company, the Individual Defendants relied in part on a secondary public offering which AMC undertook on or around February 8, 2017 (the "SPO") pursuant to the December 2016 Registration Statement. According to the Registration Statement, the purpose of AMC's February 2017 SPO was to help finance the above deals, with AMC specifically intending to use the proceeds to repay the $350 million bridge loan connected with the Carmike acquisition and to finance a portion of the Company's Nordic acquisition.

81.      As a result of the acquisitions of Carmike, Odeon, and Nordic, AMC's debt and other obligations ballooned to unsustainable proportions. Counting just the Carmike and Odeon acquisitions, between September 30 and December 31, 2016, AMC's debt nearly ***doubled*** from $3.4 billion to $6.6 billion. Furthermore, according to the December 2016 Registration Statement, AMC was obligated to service approximately $6.8 billion in new rental payments in connection with the same acquisitions. As discussed above, AMC's debt grew even further in connection with its acquisition of Nordic in early 2017.

82.      Making matters worse, due to pressure from the Chinese government, Wanda (AMC's controlling shareholder) reportedly pulled the rug out from any further financial support. On July 17, 2017, a leaked document purportedly reflected orders from the Chinese government that state-run banks should stop lending money to Wanda for Wanda's use with several of its overseas acquisitions, including AMC's deals for Carmike and Nordic. The document also reflected orders to the banks that they should not help the overseas projects with any foreign

currency or financial registrations, and that Wanda itself should not inject any of its own assets into the acquired companies. The Individual Defendants caused AMC to respond the next day, denying suggestions that any funding from Wanda was used in the recent acquisitions. Defendant Aron later bristled at what he considered "misreporting" and "wild speculation" on the matter. Nevertheless, to the extent such financing would have been helpful, AMC was completely cut off from it.

83.      AMC was highly overleveraged because of these acquisitions, making the Company vulnerable. The December 2016 Registration Statement warned investors that AMC had "substantial debt" that could limit the Company's ability to obtain future financing and consume a substantial portion of its cash flow from operations. Defendant Aron, despite being the chief architect of AMC's acquisition strategy, admitted to securities analysts prior to the SPO that he would have been "much more comfortable" if AMC's debt were lower.

84.      The Company's solvency was at risk and it had no available backstop from its controlling shareholder. Thus, the SPO was designed primarily to deleverage the Company and to help remove AMC from its precarious financial position.

### E.      The Materially False and Misleading Registration Statement

85.      Throughout the Relevant Period, Individual Defendants caused AMC to issue materially false and misleading statements to investors and omit material information that should have been disclosed. Significantly, the December 2016 Registration Statement contained multiple inaccuracies and misleading statements and omissions.

86.      In the December 2016 Registration Statement, the Individual Defendants failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were known to management and were then having, and were reasonably likely to continue to have, material adverse effects on AMC's operating performance. These included that: (i) Carmike's

theaters were in a state of significant disrepair because it had stopped investing in its theaters over a protracted period; (ii) Carmike had experienced a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC had been unable to retain or convert Carmike's loyalty program members after the acquisition.

87.     On August 4, 2017, the Individual Defendants caused AMC to hold a conference call with investors and securities analysts to discuss AMC's operating results for the period ended June 30, 2017. During the call, Aron told investors that "the quarter was simply a bust" because of four specific matters that were having a material adverse effect on the Company's results. One of the four matters identified by AMC was the performance of Carmike, demonstrating just how misleading the Company's December 2016 Registration Statement had been.

88.     Aron stated that the recently-acquired Carmike theaters had a revenue decline of 11.3% during the 2017 second quarter, while the Company's legacy AMC theaters, which he referred to as "stars," outperformed relative to the U.S. box office average.

89.     During the call, Aron specifically identified three reasons for Carmike's poor results, including that Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters: "[W]hen you look at what Carmike as a company did between April and December [of 2016] to modernize its circuit after it put itself under contract to be sold, it didn't do very much. And so the circuit essentially went on dead stop around April-ish of . . . '16. . . ." Aron further noted that "about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded."

90.     Aron also explained that Carmike had experienced a significant loss in market share during 2016 when its patrons migrated to competitors that had renovated and upgraded their

theaters. Aron stated on the call that, "in 8 of the 12 months in '16, Carmike, as a circuit, had declining market share, including . . . 3 of the 4 months between September and December. . . ."

91.     Aron also explained during the August 2017 call that AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition, noting, "[w]hen Carmike was handed over to us on December 21, [2016,] only 200,000 individuals from their loyalty program joined our loyalty program. . . . So we've had to start the loyalty program essentially over from scratch."

92.     Thereafter, Aron commented that the above-noted reasons were among the "many" factors contributing to Carmike's underperformance and that "it's going to take us a good year to essentially turn around Carmike. So I do think this [underperformance] is going to continue with us until '18."

93.     These undisclosed material trends, events, and uncertainties associated with Carmike, which were reasonably likely to have a material adverse effect on the Company's operating results at the time of the SPO, were required to be disclosed in, but were omitted from, the December 2016 Registration Statement.

94.     The December 2016 Registration Statement also incorporated by reference a number of documents, including Carmike's Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Carmike 10-Q"), which contained false and misleading statements regarding Carmike's revenue growth over the first three quarters of 2016. In relying upon those rosy statements regarding Carmike's revenue growth in the first nine months of 2016, the Registration Statement failed to disclose material changes in Carmike's affairs, including that Carmike's theaters were in a state of significant disrepair because it had stopped investing in its theaters over a protracted period and that Carmike had experienced a significant loss in market share when its

patrons migrated to competitors that had renovated and upgraded their theaters.

95.      The December 2016 Registration Statement also included materially inaccurate statements and omissions regarding Odeon, including the failure to disclose that AMC's international markets segment experienced lower sales during the summer months. The Registration Statement falsely represented that AMC's business was seasonally stronger during the summer months, stating, in pertinent part, that "[t]he most attended films are usually released during the summer and the calendar year-end holidays, making our business highly seasonal." Similar statements were also made in AMC's 2015 Form 10-K, which was incorporated by reference in the Registration Statement.

96.      These statements were materially inaccurate because, contrary to the above-noted disclosures, Odeon's operations, a major part of AMC's international business segment, generally experience much lower attendance and revenues during the summer months. This misrepresentation had real effects on investors and analysts, causing securities analysts to model AMC's post-SPO earnings incorrectly. Accordingly, the December 2016 Registration Statement contained materially inaccurate information about the seasonality of AMC's operations.

97.      The materially false and misleading December 2016 Registration Statement was signed by Individual Defendants Aron, Ramsey, Cox, Zhang, Zeng, Saich, Hill, Locke, Koch, Pawlus, and Gao.  Eight of these Individual Defendants -- Aron, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus – are members of the current Board.

### F.      Individual Defendants' Other False and Misleading Statements and Omissions

98.      The Individual Defendants also made a series of materially false and misleading statements beyond those set forth in the December 2016 Registration Statement, including regarding the operations of Carmike and the Company's recently-acquired international businesses, Odeon and Nordic.

99.     Regarding Carmike, the Individual Defendants knew but failed to disclose that: (i) AMC's operating performance was adversely affected by a protracted period of underinvestment in Carmike's theaters; (ii) Carmike experienced a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC was unable to retain or convert Carmike's loyalty program members into AMC's Stubs loyalty program after the acquisition. Instead, AMC and the Individual Defendants made rosy statements about: (i) migrating Carmike's loyalty program members to AMC Stubs; (ii) Carmike's patron visitation levels; (iii) member growth in AMC's Stubs program; and (iv) the enhancement of AMC's growth potential by joining forces with Carmike.

100.     Regarding Odeon and Nordic, the Individual Defendants knew but failed to disclose that AMC's newly-acquired international operations were slower during the summer season, which caused analysts to model AMC's post-acquisition performance incorrectly, with one analyst specifically noting that AMC's omissions "played a role in our (and likely the Street's) mismodeling of [AMC's 2017 second] quarter."

101.     ***December 20, 2016 Conference Call***. On December 20, 2016, the Individual Defendants caused AMC to announce that it had obtained U.S. Department of Justice ("DOJ") approval necessary to complete the Carmike acquisition and discussed the acquisition in a conference call with analysts and investors.

102.     On the call, Aron noted that during AMC's due diligence process, AMC determined that "there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand," and that, "[w]e have identified that there are an easy 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation." Such a renovation, as discussed above, involved upgrading those theaters to AMC-style recliner

seating. Aron told investors that "being maniacal about cost management is extremely important," adding "we're pleased by the two-brand strategy because we'll have one set of operating standards for AMC theatres, another set of operating standards for the second brand theatres, and that will allow us to be more focused on managing costs at each brand at the appropriate level."

103.     Regarding theater attendance and renovation, Aron also stated the following:

We do think the fact that we're going to commit to renovate a significant number of AMC theaters **and a significant number of Carmike theaters** and a significant number of Odeon theaters is going to cause attendance at those theaters to increase. That's good for studios, that's good for us.

* * *

We are in the business as all companies are rationally deploying and allocating capital and we will put our monies where we get the best returns as best we can figure out what they'll be. There is opportunity for investment at the AMC circuit. **There's opportunity for investment at the Carmike circuit** and there's opportunity for investment at the Odeon circuit. I expect that you will see us make improvements at each of the three circuits, although as I said on the margin, we ration capital where it produces the highest return. And so, we look at these projects one at a time, theater by theater. (Emphasis added.)

104.     Aron's statements above regarding the Carmike theaters' potential for "AMC-style renovations" and AMC's "[focus] on managing costs at the appropriate level" were knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that Carmike had allowed its theaters to stagnate without capital investment between April and December of 2016. Aron's statements were also knowingly or recklessly false and misleading because he and the other Individual Defendants never disclosed that a protracted period of underinvestment in Carmike's theaters had caused Carmike to lose market share to competitors which would require significant time and investment to reverse.

105.     The Individual Defendants also hid that the undisclosed problems with Carmike's protracted underinvestment in its theaters and resulting loss in Carmike's market share

would have a material adverse effect on AMC's capital resources and operating results.

106. ***January 23, 2017 Conference Call***. On January 23, 2017, the Individual Defendants caused AMC to announce that it had entered into a definitive agreement to acquire Nordic and hosted a conference call that day with analysts and investors to discuss the acquisition.

107. During the call, Aron also touted the execution of AMC's integration of Carmike and Odeon as having been "flawless," and reiterated his unwavering confidence that such acquisitions would have a positive impact on the Company's future:

> So far, vis-a-vis Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been ***flawless***. . . . Allocating our capital so dramatically to growth through acquisition, in both our theater count and countries served ***obviously confirms that AMC is confident and optimistic about the future of being in the movie theater business. We further believe that confidence is well-placed***.

(Emphasis added.)

108. Aron's statements regarding the "integration" and investments in Carmike and the benefits of acquiring Carmike's operations were knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that Carmike had allowed its theaters to stagnate without capital investment between April and December of 2016. Aron's statements were also knowingly or recklessly false and misleading because he and the other Individual Defendants never disclosed that a protracted period of underinvestment in Carmike's theaters had caused Carmike to lose market share to competitors which would require significant time and investment to reverse.

109. Aron also claimed that the Company's acquisitions, including Carmike and its loyalty program, were going to help grow AMC's revenues and EBITDA, and that the Company's renovation efforts were also going to generate growth:

> ***I think AMC has grown smartly this year, through M&A activity***. It's not the only

way we've grown, but I like our new website, and I like our new AMC Stubs loyalty program, and I like our new pricing department, and ***they're going to help us grow revenues and grow EBITDA***, too. But, and we are obviously investing in renovating theaters in the US and putting in recliner seating to another third of our circuit over the next two years, so ***there's plenty that's going to cause growth***.

(Emphasis added.)

110.     Aron's statements above proclaiming how the "new AMC Stubs loyalty program" would "help" AMC "grow revenues and grow EBITDA, too" were knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that AMC had lost most of Carmike's loyalty program members upon completing the Carmike acquisition and, as Aron finally admitted later, "had to start the loyalty program essentially over from scratch."

111.     During that same call, Aron announced that AMC's acquisition of Nordic would close in time to benefit from a "busy summer film slate:"

Like in our Odeon transaction, European Commission approval will be required for closing, but as we've had recent experience with [the] EU, and as we have no theaters in these seven Northern European countries presently, we believe that securing EU approval should be both painless and quick. We expect closing to happen well within the first half of 2017, and ***ahead of the busy summer film slate***.

(Emphasis added.)

112.     Aron's statement regarding the financial benefits accruing from its acquisition of Nordic, with specific emphasis on "the busy summer film slate," was knowingly or recklessly false and misleading because Aron failed to disclose that the slow summer seasons in the legacy Odeon and Nordic circuits would offset any purported benefits from the acquisitions.

113.     Further, Aron failed to disclose on the January 23, 2017 conference call that the problems with Carmike's protracted underinvestment in its theaters, the resulting loss in market share, and AMC's inability to retain Carmike's loyalty program members would have a material

adverse effect on AMC's capital resources and operating results.

114.     ***2016 Fourth Quarter and Year-End Results and Form 10-K***. On February 28, 2017, the Individual Defendants caused AMC to announce its 2016 fourth quarter and year-end financial results, highlighting AMC's record-setting fourth quarter and year-end results across its revenue categories, including admissions, food and beverage, and "other," and commenting that the SPO's proceeds would be used to pay for AMC's recent acquisitions.

115.     After the earnings announcement, the Individual Defendants caused AMC to hold a conference call with analysts and investors to discuss the Company's operations and performance. During the call, Aron announced that AMC had set all-time revenue and EBITDA records in 2016 and that the "record we set in 2016 is one that we will literally shatter in 2017:"

> AMC set new ***all-time high records*** for every revenue segment and adjusted EBITDA, exceeding $3 billion in total revenues for the first time ever, growing nearly 10% to a record $3.2 billion. ***That $3.2 billion record we set in 2016 is one that we will literally shatter in 2017, with revenues that are likely to well exceed $5 billion***.

(Emphasis added.)

116.     In addition, Aron highlighted the importance of the Company's Stubs loyalty program and announced that, since its recent redesign, its membership had "exploded," with "stunning" new-member household sign-up rates:

> During the latter half of 2016, we revolutionized our already successful loyalty program, redesigning and relaunching AMC Stubs. AMC Stubs had been locked in with about 2.5 million member households but without meaningful growth in some three years. By contrast, ***membership in the redesigned AMC Stubs has simply exploded***.
>
> AMC Stubs membership has just recently crossed over the six million member household mark. Some 5.5 million of these households have purchased an AMC ticket in the past 12 months and all have had some interaction with us in the past 24 months. ***With sign-up rates of a stunning 400,000 to 500,000 new member households continuing right now each month, we hope that we can reach 10 million member households in the AMC Stubs program and the AMC customer***

*database sometime in 2017*.

With an average of roughly three to four family members per household, our consumer database has already grown to approximately 20 million known moviegoers and should rise to 30 million to 40 million known moviegoers by later this year. To whom, we are marketing one to two times each week to sway them to see a movie, the kind of movie that they individually prefer based on past purchases and to do so at an AMC theater.

*I just cannot emphasize enough the value to our Company, of this consumer data and information. We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC*.

(Emphasis added.)

117.    Aron's statement regarding the "explo[sion]" of AMC's Stubs loyalty program was knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that AMC had lost most of the members of Carmike's loyalty program upon completing the Carmike acquisition and "had to start the loyalty program essentially over from scratch," as they later were forced to admit.

118.    Aron also represented that 2017 would be a "transition" year for Carmike, with AMC having to incur "start-up and transition costs." He commented that the benefits from "recliner renovations" would not be visible until very late in 2017 and 2018:

. . . 2017 will be a transition year for Odeon and Carmike Theaters. There are start-up and transition costs; additionally, since the recliner renovations deployments take on average six to 12 months to complete and although we have already begun, the lift in these investments won't be visible until very late in 2017 and well into 2018. Having said all that, these are absolutely the right investments to make and *we are very confident in their earnings power*.

The Carmike acquisition combined, as you know, the number two and number four circuits in the US to create the largest exhibition circuit in the US. Carmike offers AMC -- excuse me, one second. Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint. *We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating*.

We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017. We've already begun the integration in earnest, converting point-of-sale systems and vendor contracts and commencing initiative deployments.

(Emphasis added.)

119.    Aron's statements were knowingly or recklessly false and misleading because Aron referred to 2017 as being Carmike's "transition year" because of "start-up and transition costs" and "recliner renovations." In truth, however, Aron knew but failed to disclose that Carmike's operations were suffering from a protracted period of underinvestment, a material loss in market share, and that AMC was unable to retain or convert loyalty program members after the acquisition. Aron knew these facts would have a material adverse effect on AMC's capital resources and operating results.

120.    Aron also noted that 2017 consensus revenue and earnings estimates of securities analysts "seem to be in the right ballpark." Per *Thomson First Call*, the consensus Wall Street estimates at that time were $5.044 billion in revenue and $1.04 in EPS for full-year 2017. Aron's statement regarding AMC's 2017 guidance was knowingly or recklessly false and misleading because the numerous, undisclosed operational issues discussed above were having and were likely to continue to have an adverse effect on AMC's operations. Aron's 2017 financial guidance was wholly without any reasonable basis.

121.    During the Q&A session of the conference call, Aron continued to mislead investors and make materially false and misleading statements about renovations at AMC's theaters. In response to an analyst question regarding the "relative performance of theaters that have not been reseated or given enhanced food and beverage," a question specifically asked to understand "the potential level of drag those theaters are having on the overall average," Aron glossed over the significant problems at legacy Carmike theaters:

... [W]hat is the difference between the renovated theaters and non-renovated theaters? . . . Well, ***when you renovate theaters, okay, you get a big pop***. Does it sort of then, like, disappear? And the answer is no. Once we get our big pop and that tends to institutionalize the renovated theaters doing really well and they stay up there at the renovated -- at the elevated level of performance.

Where we are exposed, and where I believe our competitor is exposed, is that our renovated theaters, whether they were renovated three months ago or 24 months ago, ***our renovated theaters, as a class, are doing extremely well, with significant double-digit revenue growth that would blow your mind if we shared that number with you***.

***But, the non-renovated theaters are growing at single-digit growth, which blows our minds because we are the same Company, which shows us the power of recliner seats. So, our conclusion is the faster we can renovate theaters, the better off we are***.

... [Y]ou'll start to see Carmike Cinemas getting renovated in 2018 but, that's probably an 2018, 2019 and -- or 2018 and 2019, or 2018, 2019, and 2020 renovation plan. There is no doubt that renovated theaters are just killing in the marketplace.

Consumers are voting with their feet. And our way to handle that is to have more theaters that are renovated than anybody else and it will be by a country mile. We already have a big lead over any other large circuit in terms of renovation. And our plans for 2017 and 2018 are more aggressive than anybody else as well.

(Emphasis added.)

122.    Aron's statements were knowingly or recklessly false and misleading because Aron knew that Carmike's renovations included the need to address the protracted period of underinvestment and the resulting loss of market share due to patrons' migration, which would require significant time and investment from AMC.

123.    On March 10, 2017, AMC filed its 2016 Form 10-K with the SEC, which was signed by Aron, Ramsey, Cox, Gao, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus.  Notably, defendants Aron, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus make up a majority of the current Board.

124.    The 2016 Form 10-K contained materially false and misleading disclosures and

omissions relating to: (i) the operations of Carmike; (ii) the seasonality of AMC's foreign operations; (iii) the Company's Stubs loyalty program; (iv) AMC's MD&A; (v) AMC's financial statements; (vi) AMC's disclosure controls; and (vii) the certifications signed by Aron and Ramsey regarding AMC's disclosure controls.

125.     With respect to Carmike, the 2016 Form 10-K disclosed the following:

Legacy Carmike theaters are located primarily in smaller, suburban and rural markets, which affects total revenues per theater. ***However, in general, theaters located in smaller suburban and rural markets tend to have less competition and a lower cost structure, and we believe when combined with our innovative strategic initiatives that productivity will improve***.

* * *

In December 2016, we completed the acquisition of Carmike for cash and stock. The purchase price for Carmike was $858.2 million comprised of cash of $584.3 million and 8,189,808 shares of our Class A common stock with a fair value of $273.9 million (based on a closing share price of $33.45 per share on December 20, 2016). We also assumed $230.0 million aggregate principal amount of 6.00% Senior Secured Notes due June 15, 2023 (the "Senior Secured Notes due 2023"), in connection with the acquisition of Carmike. As of December 21, 2016, Carmike operated 271 theaters with 2,923 screens in small and mid-sized markets in 41 states, which further complements our U.S. markets segment. ***We expect to realize approximately $35.0 million of synergies and cost savings related to this acquisition as a result of purchasing and procurement economies of scale and general and administrative expense savings, particularly with respect to the consolidation of corporate related functions and elimination of redundancies***.

(Emphasis added.)

126.     The above statements were knowingly or recklessly false and misleading when made because the Individual Defendants had a duty to disclose all material facts regarding Carmike when discussing its operations. Specifically, the Individual Defendants never disclosed that Carmike had allowed its theaters to stagnate without any capital investment between April and December 2016, that this protracted period of underinvestment in Carmike's theaters had caused Carmike to lose an increasing percentage of its market share to competitors, and that these effects

would require significant time and investment from AMC to reverse course. Additionally, the Individual Defendants did not disclose the resulting material adverse effects of this underinvestment on AMC's capital resources and operating results.

127.     Concerning the seasonality of AMC's business, the 2016 Form 10-K disclosed the following, completely ignoring the contra-seasonality of its new European acquisitions:

> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, ***our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons***. Our results of operations may vary significantly from quarter to quarter. (Emphasis added.)

128.     The statements above were knowingly or recklessly false and misleading because AMC's 2016 Form 10-K (which again, was signed by a majority of the current Board) was required to disclose the seasonality of each of its business segments, including specific disclosures regarding the expectation that AMC's international business segment would experience lower attendance and revenues during the summer months.

129.     Under Individual Defendants' direction and on their watch, AMC had repeatedly told investors that it was a seasoned international theater operator. Prior to J.P. Morgan Chase and Apollo Management taking the Company private in 2004, AMC operated in thirteen different foreign countries, including the United Kingdom, Spain, and Portugal. Drawing on their prior experience of operating theaters in the very same countries in which they now sought to acquire theaters, the Individual Defendants reassured investors that they understood the international movie theater business. Accordingly, AMC and the Individual Defendants knew their obligations to disclose to investors the seasonality of AMC's new European operations.

130.     At the Citi Global Internet, Media and Telecommunications Conference on January 5, 2017, Defendant Ramsey represented the following:

> *[W]e do have experience, let me say it that way, operating in international markets*. And if you went back to a time before we were owned by private equity, if you went back into the late 1990s, you would find that *we had theater operations in 13 different countries around the world*. We then became private equity-owned and sold those assets off. *We are an experienced international operator*.
>
> * * *
>
> The strategic direction will come from AMC. *Direction, again, that bears the background and knowledge of all the years that we've successfully operated internationally*. We think the European markets are ripe for remodels and renovations. There have actually been about four remodels in the UK where they did the recliner reseating. Another exhibitor did that. And we watched – studied the box office trends and saw similar improvements in revenues post renovation similar to what we've experienced here in the U.S. So we're quite confident that the recliner remodel strategy will work well.

(Emphasis added.)

131.    Indeed, as was certified in the Company's December 2016 Registration Statement, "[o]ur senior management team has experience operating both domestic and international theatres, having at one time operated more than 100 theatres with more than 1,200 screens in 11 countries outside of the United States."

132.    On May 4, 2017, Defendant Ramsey told attendees at the B. Riley & Co. Investor Conference:

> And then, look at overseas. *We have participated in overseas markets before. One point in time, our company was in 13 different foreign countries. It's not new to us*. We got people that shower every morning and come to work, and they've had experience running companies in the territories where we're currently operating. So didn't scare us.

(Emphasis added.)

133.    The above statements confirm that the Individual Defendants were knowledgeable about international movie theater markets and thus knew or recklessly disregarded that AMC's international business would have different seasonal trends which ebbed during the summer.

134.    Regarding AMC's Stubs loyalty program, the 2016 Form 10-K disclosed as follows:

> As of June 30, 2016, prior to our national relaunch, we had 2,672,000 active member households in the AMC Stubs program. As of December 31, 2016, we had more than 5,263,000 active member households enrolled in both the AMC Stubs Premiere and AMC Stubs Insider programs, combined. New members are enrolling in the new AMC Stubs program at a rate greater than 11 times the number of enrollments during the same period in 2015. Our AMC Stubs members represented approximately 23% of AMC U.S. markets attendance during the year ended December 31, 2016. *We expect the number of member households to continue to increase over the next 24 to 36 months*. We believe movie-goers want to be recognized and rewarded for attending our theaters and as a result, our new AMC Stubs program is designed to strengthen guest loyalty, attract new guests and drive additional return visits. Our much larger database of identified moviegoers also provides us with additional insight into our customers' movie preferences, and this enables us to have both a larger and a more targeted marketing effort to support our Hollywood studio partners. *We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC*.

(Emphasis added.)

135.    The statements above were knowingly or recklessly false and misleading because the Individual Defendants knew—and only later admitted—that AMC's operating performance was being adversely affected by an inability to retain or convert Carmike's loyalty program members to AMC Stubs members after the acquisition. Specifically, the Individual Defendants failed to disclose that, as of the close of the Carmike acquisition, only 200,000 Carmike loyalty program members joined the AMC Stubs program and that AMC "had to start the loyalty program essentially over from scratch," as they later were forced to admit.

136.    The 2016 Form 10-K disclosed the following regarding AMC's renovation plans for Carmike theaters:

> As of December 31, 2016, we now feature recliner seating in approximately 190 theatres, including Dine-in Theatres, totaling approximately 1,984 screens and representing approximately 35% of total legacy AMC screens. By the end of 2017 and 2018, we expect legacy AMC theatres to operate 2,650 and 3,350 screens with recliner seating, respectively. Based on feedback from our guests, we believe there

is universal appeal for the ample space, comfort and convenience of our powered recliners, and that appeal will translate into additional attendance in new markets both domestically and in Europe. *As such, deploying powered recliners will be an integral strategy in the former Carmike and Odeon circuits going forward as we are targeting approximately 42% of our total screens to be comprised of screens with recliner seating by the end of 2021*.

(Emphasis added.)

137.    The statements above were materially false and misleading because Carmike's theaters were experiencing a period of protracted underinvestment and disrepair, a fact that the Individual Defendants knew or recklessly disregarded when disclosing these plans to investors.

138.    The MD&A section of AMC's 2016 Form 10-K also failed to disclose known trends, events, demands, commitments, and uncertainties associated with Carmike's previous operations that were known to management and that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's capital resources and operational results.

139.    The 2016 Form 10-K also knowingly or recklessly misrepresented that the financial statements contained therein were presented in conformity with Generally Accepted Accounting Principles ("GAAP"), which requires that the financial statements included in the 2016 Form 10-K disclose the seasonal nature of AMC's business activities. In violation of GAAP, the financial statements in the 2016 Form 10-K failed to disclose that AMC's international business activities experience lower attendance and revenues during the summer.

140.    Item 9A also required the 2016 Form 10-K to furnish the information called for under Item 307 of Regulation S-K, Disclosure Controls and Procedures (*see* 17 C.F.R. §229.307). Item 307 of Regulation S-K required the 2016 Form 10-K to disclose the conclusions that Aron and Ramsey had reached about the effectiveness of AMC's disclosure controls and procedures, defined as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized, and reported. The

2016 Form 10-K falsely and misleadingly represented that AMC's disclosure controls were operating effectively when in fact they were not, for the reasons alleged herein.

141.     Finally, the 2016 Form 10-K contained false and misleading certifications by Aron and Ramsey on AMC's disclosure controls and procedures, which represented and certified, among other things, that the report did not contain any untrue statements or omissions and that the financial statements and financial information included in the report fairly represented the financial condition of the Company for the relevant periods.

142.     ***2017 First Quarter Results and 10-Q***. On May 8, 2017, AMC announced its financial results for the period ended March 31, 2017. Aron commented on the results as follows:

> ***AMC is off to a tremendous and record start in 2017***. AMC's ability to purposefully act on the opportunities and innovations that drive growth continues to set us apart and further solidifies our leadership position among movie-theater operators in the U.S. and Europe. . . . Achieving record first quarter 2017 Adjusted EBITDA of $251.3 million is tangible evidence of what we have been saying for the better part of a year, that ***the earnings power of this new incarnation of a larger and more influential AMC is enormous compared to other operators and even to our own recent past***.

> . . . We would particularly point out three important developments at AMC so far this year. First, at the legacy pre-acquisition AMC theaters, we grew revenues at a meaningfully faster pace than the industry at large, due in part to our commitment to renovating theaters and the strength of our impactful marketing programs. Second, ***with our domestic acquisition, our rapid move to achieve cost synergies and efficiencies brought immediate bottom line benefit, offsetting revenue weakness that had been prevalent at Carmike for eight of the twelve months and three of the last four months of 2016***. We are directly focused on improving revenues at the acquired domestic theaters, as well as furthering the cost reduction efforts that already are well in hand. And third, we are thrilled both by our brisk start in driving immediate revenue and earnings growth in constant currency in Europe, and the likelihood that our plans to drive even more earnings through renovation of European theaters will come to initial fruition in quantity as early as the end of 2018.

> . . . ***We are only just beginning to unlock the growth potential of our recent acquisitions. The initial integration efforts of creating a transformed AMC have been done quickly and have been very smooth***. As we now move to make what we expect will be highly lucrative investments in guest-facing initiatives like powered

recliner seats, enhanced food and beverage offerings and the expansion of premium large format experiences, ***we are as confident as we could be in the future earnings potential of AMC. We remain optimistic about the opportunity to continue to deliver meaningful value to our shareholders both in the balance of 2017 and in the years ahead***. (Emphasis added.)

143.     After the earnings announcement, AMC held a conference call with analysts and investors on May 8, 2017 to discuss the Company's earnings release and operations. During the call, Aron highlighted AMC's "outstanding" results for Q1 that "exceed[ed] all consensus estimates for both revenue and EDITDA." Aron represented the following, in which he reiterated his rosy spin on the success of AMC's recent acquisitions:

> AMC's first quarter was marked most noticeably by our growth to more than 1,000 theaters and more than 11,000 screens, thanks to the closing of our Carmike and Odeon acquisitions late in Q4 '16, and the signing and ahead-of-schedule closing of our Nordic Cinema Group acquisition, wholly within Q1 '17. ***Our integration of these added theaters has gone incredibly smoothly and we have moved fast to capture expense synergies that were promised as these acquisitions were announced***.
>
> As for theater enhancement, we quickened the deployment pace for our strategic initiatives, ***with more theaters now equipped with recliner seating than anyone else in our industry***, and their attendant investment return metrics still being quite lucrative and well ahead of the 25% cash-on-cash unlevered returns of our investment hurdles. . . .
>
> ***Our marketing activity continues to amaze even us. Literally all of the Carmike Theaters will cut over to the AMC brands, programs, websites and systems by the end of this week, with the Carmike name retired. And speaking of the efficacy of those marketing programs, AMC Stubs partition -- participation continues to soar***. As of today, we have 7,553,209 AMC Stubs member households. We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago. ***So in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly***. (Emphasis added.)

144.     Aron's above statements on the smooth and synergistic integration of the Carmike theaters were knowingly or recklessly false and misleading because Aron and the other

Individual Defendants never disclosed that Carmike had allowed its theaters to undergo a prolonged period without any capital investment between April and December 2016. As discussed herein, this neglect caused Carmike to lose an increasing percentage of its market share to competitors and would require significant time and investment from AMC to reverse.

145.    Meanwhile, Aron's above statements on the participation in the AMC Stubs loyalty program were knowingly or recklessly false and misleading because Aron failed to disclose AMC's inability to retain or convert Carmike's loyalty program members after the acquisition.

146.    On the same May 8, 2017 call, Aron said the following about AMC's theater renovations:

> *We see that our commitment to improving the guest experience continues to serve us and our guests very well*. . . .
>
> As of March 31, 2017, including our Dine-In Theater locations, spot acquisitions, new builds, Dolby Cinema auditoriums and full recliner reseat renovations, AMC operated 2,078 U.S. recliner screens in 208 theaters. *Of the 75 theaters with recliners that have been open for more than a year, these theaters are seeing attendance lifts between 40% and 60%, average ticket price increases of 7% and total revenue increases averaging 64% in the first 12 months after renovation compared to the last 12 months before renovation*.
>
> *Our recliner renovation investments are still comfortably exceeding our 25% unlevered cash on cash return hurdles, while handily outperforming the first quarter U.S. industry box office revenue per screen by 830 basis points and also outpacing U.S. industry attendance per screen by 270 basis points*.
>
> In having more recliner screens than any other U.S. circuit, recliners as a percentage of AMC's U.S. theater count are now 32%, virtually all of them in the legacy AMC circuit and very few in the Carmike circuit. As long as the financial returns stay as solid as they are now, we expect to renovate an additional 118 theaters in the United States, representing 1,480 U.S. screens in 2017 and 2018, which would bring us to 326 recliner-equipped theaters in the U.S. That's about 51% of our entire domestic footprint, including all of the theaters of the newly-acquired Carmike circuit, which were off to a very slow start under prior ownership. *So the opportunity with all these recliner-equipped theaters to deliver outsized performance of returns in the immediate term ahead is clear. Continued investment in our strategic initiatives across both our legacy and acquired theaters will continue to create value for AMC and for our shareholders*.

(Emphasis added.)

147.     The above statements were knowingly or recklessly false and misleading because Aron knew that AMC's operating performance was being adversely impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition. These matters were then having and were reasonably likely to continue to have a material adverse effect on AMC's overall operations.

148.     Aron provided additional commentary during the May 8, 2017 conference call on AMC's loyalty program and marketing efforts:

> **We could not be more excited about our AMC Stubs loyalty program** and the redesigned website and mobile apps that span the divide between the physical theater setting and the digital experiences our consumers prefer.
>
> As previously mentioned, **our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States**. These tens of millions of purchase histories now captured in our database offer us a **treasure trove** of data and consumer information for us to use to market AMC and future movie going more effectively. (Emphasis added.)

149.     The above statements were knowingly or recklessly false and misleading because Aron failed to disclose that AMC's operating performance was being adversely impacted by its inability to retain or convert Carmike's loyalty program members after the acquisition. These matters were then having and were reasonably likely to continue to have a material adverse effect on AMC's operations.

150.     Significantly, Aron unambiguously represented during the May 8, 2017 conference call that the Carmike integration was "running very smoothly" and "[t]here have

literally been no operational snafus of any note to report":

> ***The integration of Carmike into AMC is running very smoothly***. As you know, we are retiring the Carmike name and are rebranding all our theaters as AMC, about 400 of the 644; or AMC Dine-In, about 45 of the 644; or AMC Classic, about 200 of the remaining theater locations in the U.S. However, as our AMC and AMC Dine-In Theaters are considerably larger and get considerably more visitation, only about 10% of our revenues will fall under the AMC Classic marquee.
>
> ***We have made great progress with the conversion of the acquired theaters. We only have 2 Carmike theaters as we speak, and by the end of this week, all Carmike theaters will have gone through their cutover to AMC systems, processes and brands. There have literally been no operational snafus of any note to report to you, and the new larger AMC is showing movies every day without pain in a much bigger national footprint***.

(Emphasis added.)

151.     Aron then stated that AMC soon expected to "reverse" Carmike's 2016 "revenue

weakness":

> . . . with Carmike, we have inherited a circuit that was showing revenue weakness in 8 of the 12 months in 2016 and in 3 of the 4 months in the last trimester of 2016. Candidly, that was one of the allures to us of acquiring Carmike. ***As we look to the end of 2017 and into 2018, we are highly confident that AMC's marketing activity and product ideas will generate a meaningful revenue boost to the Carmike theaters just newly added to our domestic platform***.
>
> Fortunately, we were so aggressive in reducing expense and in achieving expense synergies that the cost savings are offsetting short-term revenue softness – again, which I'm quick to add, ***we expect to reverse soon*** on our watch. (Emphasis added.)

152.     In response to analysts' questions, Aron misleadingly attempted to minimize the

significance of Carmike's revenue softness:

> ***With respect to the Carmike theaters, when I talk about revenue softness, I'm not talking about revenue declines. What I'm talking about is that the AMC Theaters have been growing faster than the Carmike theaters have been growing, if you take, though, the totality of it all***. So no, we're – there's no thought to shuttering any Carmike theaters.
>
> We think we have an A team in place here in Kansas City that has generated great results for AMC over the past year. That's why AMC revenues are up 6.2% when the industry is up 4%, 5%. That same team is now wholly focused on the Carmike

theaters, not only from a system basis but also theater-by-theater. ***And we're highly confident we're going to make a lot of progress across the Carmike system***. (Emphasis added.)

153.   Aron continued to downplay the significant, looming issues with Carmike:

> ***On the issue of Carmike, I – it's really complicated. There are a lot of Carmike theaters that are doing just great. So we've gotten quite granular looking theater by theater by theater, and there are so many reasons***. And I want to be careful what I say because I don't want to say anything uncharitable to the prior management team. It's a problem that we inherited. It's a problem that we'll solve.
>
> You could imagine, with any company that announced it was for sale in March and got sold in December, that decisions that might have been taken to drive short-term performance might have been put on hold, thinking those are more appropriate decisions that should be taken by the new owner. That's one argument.
>
> ***Another argument is some of the Carmike theaters did have competitive activity around them. And they – since Carmike was not a company that really believed in recliner seats, they didn't counter some of that competitive activity by putting in re-seated theaters of their own***. Clearly, that's something that will change. (Emphasis added.)

154.   Aron went on to contrast AMC's approach to theater renovations with the

needs at some of Carmike's properties, emphasizing the "upside" to come:

> When we have a theater that we renovate, we do it in 3 to 6 months. ***Two of the largest theaters in their system, they shut down for renovation, and I believe they're going to be closed for 15 months – which, again, I know it's only 2 theaters out of 270***, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, it matters.
>
> There's a lot more than that. We've already taken 5 of their theaters. For example, that they had as sub-run theaters, meaning they're showing older films, and we've already converted those – at a very deeply discounted price. We've already converted those theaters to first-run movie houses, showing the latest Hollywood releases at full price.
>
> So there are a lot of reasons there – for as many of their theaters, there are sort of reasons that affect big patches of their theaters, and we think we have a solid understanding of what the issues have been, theater by theater, and we're putting in solutions, theater by theater.
>
> The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days. The first cut-over was mid-January, and the last cut-over is

going to be mid-May. ***So as these theaters become AMC-branded theaters with more potent marketing programs and the like and some targeted investment to improve the product, we think we'll see real benefits***.

***So we're not at all upset about all this. It's just more upside to come. And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with***.

(Emphasis added.)

155.    The above statements were knowingly or recklessly false and misleading because Aron knew that the "prior management team" had allowed Carmike's theaters to stagnate without investment between April and December of 2016 and, as a result, had lost significant market share to competitors which would take significant time and investment to reverse.

156.    On May 8, 2017, AMC filed with the SEC its Form 10-Q for the quarter ended March 31, 2017, signed by Aron and Ramsey. The Q1 2017 Form 10-Q contained the same materially false and misleading disclosures and omissions detailed above with respect to AMC's 2016 Form 10-K and other statements regarding the operations of Carmike including: (i) the protracted period of underinvestment in Carmike's theaters; (ii) the seasonality of AMC's foreign operations; (iii) the inability to retain or convert Carmike loyalty program members to the AMC Stubbs program; (iv) misstatements and omissions in AMC's MD&A and financial statements; and (v) misstatements and omissions in AMC's disclosure controls and Aron's and Ramsey's certifications thereof.

### G.    Accounts of Confidential Witnesses in the Securities Class Action

157.    Several confidential witnesses whose accounts have been included in the Securities Class Action pertaining to these same matters have confirmed the Individual Defendants' knowledge of the materially false and misleading statements and omissions discussed

herein.

158.    For example, it has been alleged that according to CW-1, employed by AMC as a systems administrator between June 2011 and December 2017, AMC originally considered acquiring Carmike in 2014, but ultimately "pulled the plug" after its due diligence uncovered unexpected issues and weaknesses.

159.    According to CW-1, the Company's potential acquisition of Carmike was first examined by AMC's executive leadership in 2014. CW-1 stated that, during this earlier review, he/she and other AMC employees were scheduled to visit Carmike's headquarters in Atlanta, Georgia, to conduct a thorough review of its information technology ("IT") infrastructure. CW-1 stated that such a review never occurred, as AMC's management came to the conclusion that Carmike was a "lemon."

160.    CW-1 corroborated exactly what AMC was later forced to admit in August 2017— namely, that Carmike suffered from an extended period of underinvestment. According to CW-1, Carmike had been outsourcing its IT infrastructure needs to save money, thereby necessitating "major renovations" to its IT infrastructure. CW-1 also noted that the Carmike theaters needed updates to their physical equipment, including theater wiring, as well as hardware, such as projectors.

161.    According to CW-1, AMC constantly "struggled" with the outdated state of Carmike's theaters, as it was difficult to determine how to support the equipment in its theaters and network them operationally. CW-1 explained that, while AMC eventually developed a process for integrating each Carmike theater, it had to employ a "paradigm shift" in order to accommodate these newly-acquired theaters.

162.    According to CW-1, the process of integrating and renovating the infrastructure

of the Carmike theaters remained ongoing from the close of the acquisition until the end of his/her tenure in December 2017.

163.     The statements made by CW-1 were echoed by CW-2, one of 12 Carmike district managers, who was employed by Carmike from October 2005 to December 2016.

164.     According to CW-2, who was responsible for overseeing about 10% of Carmike theaters located in 12 states across the western United States, approximately 70% of the theaters he/she managed were in "disrepair," a figure that CW-2 relayed was likely true for the entire population of Carmike theaters.

165.     CW-2 stated that, in some cases, even more critical renovations and repairs were not approved by Carmike's corporate offices when theaters suffered losses. By way of example, CW-2 said that it took years to get corporate approval to fix a broken HVAC system on the roof of one of his/her managed theaters. In fact, CW-2 stated that Carmike "consciously neglected" the theater chain and that, as a result, the cost to update the circuit would be "huge."

166.     Carmike's Schedule 14A filed with the SEC on October 11, 2016 states that AMC called off its earlier 2015 bid to acquire Carmike because AMC's "management and board grew increasingly less comfortable with the terms of the transaction." At the time, defendants Zhang, Saich, Hill, Koch, and Pawlus served on AMC's board of directors.

167.     As noted below, at the end of the relevant period in August 2017, when the Individual Defendants finally disclosed to investors that Carmike's operations had been suffering because of underinvestment, Aron falsely stated that Carmike failed to make investments in its theaters after AMC announced its intention to merge with Carmike in March 2016. Aron stated, in pertinent part, that "when you look at what Carmike as a company did between April and December [of 2016] to modernize its circuit after it put itself under contract to be sold, it didn't do

very much. And so the circuit essentially went on dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16. . . ." CW-2, however, confirmed that Carmike had pursued an extremely slow pace of making renovations to its theaters for a period of at least three to four years preceding the announcement that AMC would acquire Carmike, and that there was no change in the pace at which Carmike renovated its theaters following the acquisition announcement in March of 2016.

168.     CW-2 also stated that Carmike meticulously tracked the operational and financial performance of its theaters, and that it compiled and disseminated detailed profit and loss reports on the status of each theater on a monthly basis. Moreover, CW-2 confirmed that a significant number of theaters in Carmike's circuit had been losing money for the last few years.

169.     CW-2 relayed that corporate personnel in Carmike's headquarters provided AMC with operational and financial data about Carmike during AMC's due diligence process. Based on conversations with personnel in Carmike's headquarters, CW-2 learned that AMC representatives began working out of Carmike's headquarters on a daily basis beginning in April 2016.

170.     CW-2 stated that none of Carmike's data was off limits to the AMC representatives, and added that, by the summer of 2016, Carmike executives directed its managers to give the AMC representatives access to "whatever they wanted," including operational and financial data that was recorded on a real time basis. CW-2 reiterated that the AMC representatives had direct access to Carmike's data for months during their due diligence process.

171.     CW-2 also stated it was clear that Carmike's theaters were underperforming and that it was common knowledge among the employees and executives at Carmike that the theater chain was experiencing significant revenue weaknesses during AMC's due diligence process. In

fact, CW-2 believes that Carmike's former CEO, David Passman, had acknowledged in some manner that Carmike would have gone bankrupt in six months without AMC's acquisition deal.

172.     As Aron acknowledged during AMC's December 20, 2016 investor conference call, the Company's due diligence process, which included working with the DOJ as part of its antitrust examination, provided the Individual Defendants with detailed knowledge, both positive and adverse, about Carmike's operations prior to the acquisition.

173.     The Individual Defendants also knew that, contrary to its U.S. business operations, AMC's newly-acquired international operations were slower during the summer season.

174.     CW-3 served as a Senior Project Manager contractor on the Company's Odeon integration project from September 2016 to January 2017. In this capacity, CW-3's team was responsible for receiving, mapping, and integrating Odeon's financial reporting data into AMC's Hyperion Financial Management system ("Hyperion"), which CW-3 explained was AMC's financial planning and budgeting software program. The technical business lead for CW-3's team working on integrating the financial reporting of Odeon's business with AMC was Ryan Gound, AMC's Director of Accounting Systems.

175.     According to CW-3, AMC began receiving raw financial data from Odeon in September 2016, and such data was successfully mapped and integrated into the Company's Hyperion system by December 31, 2016. CW-3 confirmed that the information received from Odeon and integrated into the Company's Hyperion system was granular enough to allow the Individual Defendants to understand monthly and seasonal financial performance trends in Odeon's business.

176.     Additionally, according to CW-4, a former Senior Director of Enterprise

Applications and Operations from April 2017 to March 2018, AMC had intended to convert all prior members of Carmike's loyalty program to the AMC Stubs program but that it was too expensive for AMC to "auto enroll" members and, therefore, AMC was dependent on Carmike loyalty program members signing themselves up for AMC's program.

### H.     The Truth Is Revealed

177.     On August 1, 2017, after the market closed, the Individual Defendants caused AMC to announce its preliminary financial results for the 2017 second quarter, ending June 30, 2017. AMC announced that it expected to report total revenues during the quarter of approximately $1.2 billion and a net loss in the range of $178.5 to $174.5 million—a loss of $1.36 to $1.34 per diluted share. The announcement also stated that AMC's 2017 revenues were expected to be between $5.10 and $5.23 billion and its 2017 net loss to be between $150 and $125 million—a loss of $1.17 to $0.97 per diluted share.

178.     In response to these significantly worse-than-expected results, the price of AMC common stock plummeted nearly 27% on very heavy trading volume, falling from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017—a 57% drop from its most recent high of $35.45.

179.     On August 4, 2017, AMC held a conference call with analysts and investors to discuss the Company's preliminary second quarter results. Aron commented flatly that the second quarter was "simply a bust," highlighting several reasons for the Company's poor results, including admitting for the first time that "Q2, seasonally, is often the smallest quarter of the year in Europe."

180.     During Q&A, a securities analyst asked if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]?" In response, Aron used the false pretext of AMC's international operations being accounted for under international accounting standards as the reason for the Company's prior non-disclosure.

181.     After the release of AMC's 2017 second quarter preliminary earnings results, securities analysts discussed the seasonality of AMC's international business, including an observation from one analyst that it "played a role in our (and likely the Street's) mismodeling of the quarter."

182.     Aron also finally highlighted Carmike's performance as a major contributor to AMC's poor 2017 second quarter results, stating that "[o]ur legacy AMC theaters were stars, outperforming the industry, but our acquired Carmike theaters . . . were not stars." He explained that during the 2017 second quarter, the box office results in the entire United States were down 4.4% while, in contrast, admissions revenues at legacy AMC theaters—largely renovated with new reclining seats—were down only 3.1%. However, the newly-acquired Carmike theaters suffered an extreme ***11.3% revenue decline*** during Q2—nearly triple the national average.

183.     Aron also dismissed the "substantial savings" AMC had realized during the quarter, noting that it was "all absorbed by and offset by higher operating costs."

184.     During Q&A, Aron explained that Carmike's poor 2017 second quarter performance was caused by "literally six" different issues that had been having a material adverse effect on Carmike's operations and patron attendance, which AMC estimated would take until at least 2018 to resolve. Among these issues was a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters as well as AMC's inability to retain or convert Carmike's loyalty program members after the acquisition.

185.     Aron confessed regarding Carmike's loss of market share and lack of investment:

> [W]e mentioned this a little bit on the first quarter call, as we went back and looked, in 8 of the 12 months in '16, Carmike, as a circuit, had declining market share, including 3 of the past – 3 of the 4 months between September and December, ***it had declining market share. When you look at what Carmike as a company did***

*between April and December to modernize its circuit after it put itself under contract to be sold, it didn't do very much. And so the circuit essentially went on dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16, and we didn't get to change that until December of '16.* What we found is that we've already gone through each of the several hundred Carmike theaters one by one with this – across the top – departmental team that I've told you about, and *there are literally six different reasons that tend to come up most often as to what's going on* in a particular theater.

(Emphasis added.)

186.     Aron also admitted AMC's inability to retain or convert Carmike's loyalty program members:

> I'll give you another. When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program. Even though – even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program. So we've had to start the loyalty program essentially over from scratch. (Emphasis added.)

187.     Aron then discussed Carmike's poor performance and how long it might take for AMC to turn it around:

> And as I said, there have been many identified issues. And they got to be knocked down one at a time. And as we looked at the issues that were floating around the Carmike circuit, about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded. . . . Another issue for Carmike is it had 2 of its biggest, most successful theaters that were closed for renovation. And the theaters were closed for over a year. And they're just coming back on stream this summer. So we're going to get a material bump theoretically by 2 of their biggest, strongest and best-performing theaters finally reopening and coming back online. And it's literally issue-by-issue. . . . Can we turn this circuit around in 9 months? So is it January to March of '18? Or is it taking us 12 months and it's January to June of '18? Or does it taking us slightly longer than that? I don't know. But I'm hopeful that we can get it sorted out and turned in the first half of '18.

188.     As a result of the materially false and misleading statements and omissions alleged herein, AMC common stock traded at artificially inflated prices throughout the relevant time period. By making or otherwise permitting these statements, the Individual Defendants

materially misled the investing public, thereby inflating AMC's stock price. These statements and omissions as alleged herein were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about the Company and its business.

### I.      The Securities Class Action is Sustained

189.      In light of these events, the Securities Class Action was initiated in February 2018.  The Securities Class Action alleges that AMC and the Individual Defendants made a series of false and misleading statements to a class of stock purchasers during the Class Period, in violation of the Exchange Act and the Securities Act.

190.      In particular, the Securities Class Action alleges that during the Class Period, the defendants made false and misleading statements touting AMC's integration of several acquired companies and its post-merger business prospects, while failing to disclose numerous problems and pitfalls with those integration efforts and their disastrous effects on the Company, which ultimately caused AMC's stock price to crater when the full truth was revealed to investors. The allegations in the Securities Class Action are further supported by the confidential witness accounts described above, pursuant to which confidential witnesses described the defendants' conduct, including the defendants' knowledge of the serious problems being hidden from stockholders.

191.      By order dated September 23, 2019 (Docket 137), this Court denied in substantial part defendants' motion to dismiss the Securities Class Action, finding that there were sufficient allegations raised in the Securities Class Action that the defendants had omitted material information regarding Carmike's underinvestment in its theaters, Carmike's loyalty program, and the seasonality of the Company's European business, and that it had been plausibly alleged that the defendants either failed to disclose or failed to update their disclosures of material information to AMC investors.

192.     This Court also ruled that loss causation and standing had been adequately alleged, and that the Company's directors and officers -- including all of the Individual Defendants herein -- were control persons of the Company. Specifically, this Court concluded that defendants Aron and Ramsey were control persons under Section 20(a) of the Exchange Act because they "signed the Registration Statement and other SEC filings." This Court similarly ruled that all of the individual defendants in the Securities Class Action—including all of the Individual Defendants here—were control persons under Section 15 of the Securities Act because "all of the Individual Defendants either 'signed the registration statement personally or through an attorney-in-fact.'"

193.     Notably, a majority of the members of the current Board are also defendants to the Securities Class Action, and have had claims sustained against them in that case.

### J.     The Individual Defendants' Knowledge of the Misconduct Alleged Herein

194.     In the Securities Action, Exchange Act and Securities Claims against the Individual Defendants and the Company were sustained by this Court in September 2019 based on three categories of material omissions from the Company's SEC filings and other public statements, which generally correspond to: (1) Carmike had underinvested in its theaters such that they were in a state of disrepair; (2) AMC was unable to retain or convert members of Carmike's loyalty program to AMC's loyalty program following the Carmike acquisition; and (3) AMC's newly acquired international theaters (Nordic and Odeon) typically had lower sales during the second quarter. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

195.

196.





200.

201.

202.



203.

204.

205.





**K.    Damages to AMC Resulting From the Individual Defendants' Breaches of Fiduciary Duty and Violations of Federal Law**

211.    AMC has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

212.    As a direct and proximate result of the Individual Defendants' conduct, AMC

has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

> (a)     legal fees associated with the lawsuits filed against AMC and its officers and directors for violations of the federal securities laws, including the Securities Class Action;

> (b)     loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

> (c)     amounts paid to outside lawyers, accountants, and investigators in connection with any investigation; and

> (d)     loss of revenues and profits.

## VI.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

213.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

214.     Plaintiffs are current shareholders of the Company, were shareholders of the Company at the time of the Individual Defendants' wrongdoing alleged herein, and have been shareholders of the Company continuously since December 31, 2014 (for Plaintiff Dinkevich) and June 30, 2016 (for Plaintiff Carter).

215.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

216.     As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

217.     The Board currently consists of eleven (11) directors: defendants Aron, Hill,

Koch, Locke, Pawlus, Saich, Zeng and Zhang and non-parties Philip Lader, Adam J. Sussman and Lee E. Wittinger.[3] A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiffs have adequately alleged that there is reason to doubt that at least six (6) current directors of AMC are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A. Each Board Member Faces a Substantial Likelihood of Personal Liability Due to Sustained Claims in the Securities Class Action

218. A majority of the Board (eight out of the eleven current directors), including defendants Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang, signed the Registration Statement, pursuant to which the Company conducted the February 8, 2017 SPO. This filing and related filings were materially false and misleading as described above because they failed to disclose: (i) the known state of Carmike's theaters at the time of the Carmike acquisition; (ii) that conversion of Carmike's loyalty program to AMC's loyalty program following the Carmike acquisition would be key; and (iii) AMC's newly acquired international theaters (Nordic and Odeon) typically experienced lower sales during the second quarter.

219. Likewise, these same eight current Board members also signed the Company's materially false and misleading 2016, 2017, and 2018 Annual Reports on SEC Form 10-K. By concealing: (i) the state of Carmike's theaters at the time of the Carmike acquisition; (ii) that conversion of Carmike's loyalty program to AMC's loyalty program following the Carmike acquisition would be key; and (iii) that AMC's newly acquired international theaters (Nordic and

---

[3] Non-parties Lader, Sussman, and Wittinger were appointed to the AMC Board after the wrongdoing complained of herein, and are not alleged to have breached their fiduciary duties at this time.

Odeon) typically experienced lower sales during the second quarter, these Board members violated their non-exculpable fiduciary duties of loyalty and good faith. As a result of having signed the Registration Statement for the February 8, 2017 SPO, defendants Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang are all exposed to potential individual financial liability, cannot be disinterested, and cannot exercise independent business judgment on the issue of whether AMC should prosecute this action. As such, demand is futile for this independent reason.

220.    Each of defendants Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang face a substantial likelihood of personal liability based on the related Securities Class Action. Each is a defendant in this Securities Class Action and the Securities Class Action plaintiffs' claims against these eight defendants have overcome a motion to dismiss and are proceeding towards trial. *See* Order Denying Motion to Dismiss, Sept. 20, 2019. The potential liability of these eight current Board members, therefore, is not speculative and thus the likelihood of personal liability is sufficient to excuse demand.

**B.    The Board is Beholden to Wanda**

221.    The Board is dominated and controlled by Wanda.  Indeed, AMC's own public filings confirm this conclusion.

222.    Defendant Zhang, the Company's Executive Chairman, is a longtime Wanda senior executive and currently serves as President of Wanda Cultural Industry Group, a position he has held since 2012. According to AMC's most recent Proxy Statement on Form DEF 14A, "Wanda controls a majority of the combined voting power of our Common Stock at the record date and therefore will be able to control all matters submitted to our stockholders for approval at the Annual Meeting." The 2019 Proxy Statement further states the following:

We avail ourselves of the "controlled company" exception under the rules of the NYSE, which permits a listed company of which more than 50% of the voting power for election of directors is held by an individual, a group or another company to not comply with certain of the NYSE's governance requirements. ***Because more than 50% of our voting power is held by Wanda, we are not required to have a majority of independent directors on our Board. We currently have four independent directors, Mr. Hill, Dr. Saich, Ms. Pawlus, and Mr. Wittlinger, as determined by our Board in accordance with NYSE rules.*** In addition, while we are not required to have a Compensation Committee or a Nominating and Corporate Governance Committee, we have established such committees, each of which is composed of three directors, at least one of whom from each committee is independent.

Our Board has determined that Mr. Hill, Dr. Saich, Ms. Pawlus, and Mr. Wittlinger are independent in accordance with NYSE rules and within the meaning of the Securities Exchange Act of 1934 (the "Exchange Act") for purposes of serving on our Audit Committee. ***The remaining members of the Board, Mr. Locke, Mr. Zeng, Mr. Aron, and Mr. Koch, are not independent under the NYSE rules or within the meaning of the Exchange Act.***

223.     In short, AMC's own SEC filings confirm that at AMC, whatever Wanda says goes, regardless of the legality of such actions or whether following Wanda's directives would be counter to the best interests of AMC. As such, demand is excused.

## C.     The Audit Committee Faces a Substantial Likelihood of Personal Liability

224.     Defendants Saich, Pawlus and Hill served as members of the Audit Committee throughout the Relevant Period. The Company's Audit Committee Charter states that the members of the Audit Committee were and are responsible for, among other things, overseeing: (a) management's conduct of, and the integrity of, the Company's financial reporting to any governmental or regulatory body, shareholders, other users of Company financial reports and the public; (b) the Company's systems of internal control over financial reporting and disclosure controls and procedures; (c) the Company's legal and regulatory compliance; and (d) the application of the Company's codes of business conduct and ethics.

225.     Defendants Saich, Pawlus and Hill and the Audit Committee, among other

things, caused and/or permitted the Company to adopt ineffective internal controls over disclosure and financial reporting, which have rendered certain of the Company's previously disseminated financial statements false and misleading. These actions caused defendants Saich, Pawlus and Hill to breach their fiduciary duties and now subject each of them to a substantial likelihood of liability.

### D.   Defendant Aron Is Not Independent

226.   Defendant Aron is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Aron's principal professional occupation is his employment as CEO of the Company, pursuant to which he has earned and stands to earn tens of millions of dollars in annual salary, bonuses and other compensation. In 2016, 2017 and 2018, defendant Aron earned $10.9 million, $7.4 million and $9.4 million, respectively.

227.   Accordingly, defendant Aron is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Aron is not independent.

### E.   Defendant Zhang Is Not Independent

228.   Defendant Zhang is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Zhang's principal professional occupation is his employment as President of Wanda Cultural Industry Group, a division of the larger Wanda conglomerate. Pursuant to this employment by AMC's controlling shareholder, Zhang has earned and stands to earn tens of millions of dollars in annual salary, bonuses and other compensation.

229.   Accordingly, defendant Zhang is incapable of independently and disinterestedly

considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Zhang is not independent.

### F.    Defendants Locke and Koch are Not Independent of Wanda

230.    The Company's Board determined, prior to the filing and publication of each Annual Proxy Report on Form DEF 14A which directors were independent and which were not on an annual basis. In the Company's most recent Proxy Statement, the Company admits that defendants Locke and Koch "*are not independent under the NYSE rules or within the meaning of the Exchange Act.*"

231.    Because this Action has to do with decisions that impact the controlling shareholder – Wanda – and the placing of Wanda's interests before AMC's interests, these inherent conflicts for defendants Locke and Koch are disabling for purposes of demand for the claims asserted herein, making demand futile for each.

### G.    A Majority of the Members of the Board Face a Substantial Likelihood of Liability Because they Had Actual Knowledge of – or Recklessly Disregarded – Material Undisclosed Facts

232.    During the Relevant Period, Individual Defendants Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang (8 out of the 11 current Board members) were responsible for reviewing and approving the Company's SEC filings and financial statements prior to their publication. None of the Company's SEC filings during the Relevant Period disclosed: (i) the state of Carmike's theaters at the time of the acquisition; (ii) that conversion of Carmike's loyalty program to AMC's loyalty program following the Carmike acquisition would be key; and (iii) that AMC's newly acquired international theaters (Nordic and Odeon) typically experienced lower sales during the second quarter. ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

233.     These material facts were well known within AMC and to the Individual Defendants. As such, the Individual Defendants had a duty to ensure that the Company's SEC filings did not contain material omissions. Again, each Individual Defendant failed to do so. ███

███████████████████████████████████████████████████

██████████████████████████████████████████████. A director's breach of the duty of candor is not entitled to protection under the business judgment rule.

234.     As a result, any demand upon Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang to bring suit against themselves would be a useless and futile act. Their knowing and/or reckless breaches of fiduciary duty constitute bad faith under Delaware law. Bad-faith conduct is non-exculpable and is not protected under the business judgment rule. Thus, Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang face a substantial likelihood of liability. Demand is thus futile and excused.

235.     Furthermore, Aron, Hill, Koch, Locke, Pawlus, Saich, Zeng and Zhang signed the Company's 2016, 2017 and 2018 10-Ks, which failed to disclose the foregoing, making each

materially false and misleading. As such, each Individual Defendant faces a substantial likelihood of personal liability, excusing demand.

### H.   Demand is Excused Because the Governance Committee is Obligated Per Its Charter to Investigate Matters Such as This and Chose Not to Do So

236.   Defendants Saich, Locke and Koch served on the Board's Nominating Committee during the Relevant Period. The Nominating and Corporate Governance Committee Charter provides that the members of that committee are duty-bound to assist the Board in developing, recommending to the Board and overseeing implementation of the Governance Guidelines, and reviewing regularly the overall corporate governance of the Company. In connection with those duties, "the Committee is empowered to inquire into any matter it considers appropriate to carry out its responsibilities."

237.   Despite the filing of the Securities Complaint containing the accounts of the confidential witnesses as described herein, and despite this Court subsequently upholding Securities Act and/or Exchange Act claims against the Company and the Individual Defendants named herein in the Securities Class Action, to date, upon information and belief, the Nominating Committee has failed to conduct any inquiry whatsoever into these matters, despite their duty to do so under the Charter. For this reason, demand is futile as to defendants Saich, Locke, and Koch, if not the entire Board.

## VII.   CLAIMS

### COUNT I
### For Contribution and Indemnification Under the Securities Exchange Act of 1934 Against the Individual Defendants

238.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

239.     The Individual Defendants named in this Count are named as defendants in the related securities class action pending before this Court. The conduct of these defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

240.     The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If AMC is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

241.     The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

242.     As officers and directors, the Individual Defendants had the power and ability to, and did, control or influence, either directly or indirectly, AMC's general affairs, including the content of its public statements, and had the power and ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act, SEC Rule 10b-5, and other securities laws.

243.     The Individual Defendants are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Securities Exchange Act of 1934.

244.     The Individual Defendants accordingly have damaged the Company and are liable to the Company for contribution and/or indemnification.

245.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**COUNT II**
**Rescission of Employment Contract Compensation Under Section 29(B) of The Exchange Act Against Defendants Aron and Ramsey**

246.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though full set forth herein.

247.     Defendants Aron and Ramsey named in this Count are named as defendants in the related securities class action pending before this Court. The conduct of these defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

248.     Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

249.     Every contract made in violation of any provision of this chapter or any rule or regulation thereunder and every contract ... heretofore on hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void ... as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

250.     Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

251.     Defendants Aron and Ramsey violated the federal securities laws while performing their duties under various agreements they had with AMC, and AMC is entitled to rescission of those agreements.

252.     AMC was and is an innocent party with respect to Defendants Aron's and

Ramsey's Exchange Act violations.

253.    Defendant Aron's compensation for the fiscal year ended December 31, 2016 totaled $10,932,004. This compensation included $991,200 in salary, a $4.5 million bonus, $4,281,202 in stock awards, $1,144,250 in non-equity incentive plan compensation, and $15,352 in all other compensation. Defendant Aron's compensation for the fiscal year ended December 31, 2017 totaled $7,447,156. This compensation included $1.1 million in salary, $5,605,208 in stock awards, $726,000 in non-equity incentive plan compensation, and $15,948 in all other compensation.

254.    Defendant Ramsey's compensation for the fiscal year ended December 31, 2016 totaled $2,659,220. This compensation included $563,800 in salary, a $700,000 bonus, $962,930 in stock awards, $48,906 in change in pension value and nonqualified deferred compensation earnings, $363,078 in non-equity incentive plan compensation, and $20,506 in all other compensation. Defendant Ramsey's compensation for the fiscal year ended December 31, 2017 totaled $2,347,070. This compensation included $650,000 in salary, $1,399,997 in stock awards, $126,217 in change in pension value and nonqualified deferred compensation earnings, $150,150 in non-equity incentive plan compensation, and $20,706 in all other compensation.

255.    Plaintiffs, on behalf of AMC, seek rescission of the contracts between Defendants Aron and Ramsey and AMC due to these defendants' violations of the Exchange Act while performing their job duties.

256.    As a result of the foregoing, AMC is entitled to rescission of these agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT III
### Breach of Fiduciary Duty Against the Individual Defendants

257.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

258.     The Individual Defendants, as current or former AMC officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

259.     By virtue of their positions as AMC directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

260.     Each Individual Defendant was required to: (a) use his or her ability to control and manage AMC in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of AMC rather than his or her own interests.

261.     By their acts alleged herein, including but not limited to causing AMC to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

262.     The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

263.     AMC has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

**COUNT IV**
**Against the Individual Defendants for Unjust Enrichment**

264.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

265.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AMC.

266.     Plaintiffs, as shareholders and representatives of AMC, seek restitution from these the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing AMC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to AMC restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: April 7, 2020                          Respectfully Submitted,

                                              */s/ Richard A. Speirs*
                                              Richard A. Speirs
                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                              88 Pine Street, 14th Fl.
                                              New York, New York, 10005
                                              Phone: (212) 838-7797
                                              Fax: (212) 838-7745
                                              Email: rspeirs@cohenmilstein.com

                                              *Counsel for Plaintiffs*

Kip B. Shuman
**SHUMAN, GLENN & STECKER**
100 Pine Street, Ste. 1250
San Francisco, CA 94101
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: kip@shumanlawfirm.com

Rusty E. Glenn
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com

Brett D. Stecker
**SHUMAN, GLENN & STECKER**
326 W. Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: brett@shumanlawfirm.com

D. Seamus Kaskela
**KASKELA LAW LLC**
18 Campus Blvd., Suite 110
Newtown Square, PA 19073
Telephone: 484-258-1585
Facsimile: 484-258-1585
Email: skaskela@kaskelalaw.com

*Of Counsel for Plaintiffs*

## AMC Entertainment Holdings, Inc. Verification

I, David Dinkevich, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint and that I have authorized the filing of the Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: April __3__, 2020

_____

David Dinkevich

**<u>AMC Entertainment Holdings, Inc. Verification</u>**

I, Ann Carter, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint and that I have authorized the filing of the Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: April 2<u>nd</u>, 2020

Ann Carter